**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION**

| | | |
|---|---|---|
| ATLANTIC CASUALTY INSURANCE | § | |
| COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. <u>7:21-cv-00080</u> |
| | § | |
| TOP GYM LLC, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF, ATLANTIC CASUALTY INSURANCE COMPANY'S,
<u>COMPLAINT SEEKING DECLARATORY JUDGMENT</u>**

Plaintiff, Atlantic Casualty Insurance Company (Atlantic Casualty), hereby files its Complaint seeking a declaratory judgment and respectfully shows the Court as follows:

**I.
<u>PARTIES</u>**

1.     Plaintiff Atlantic Casualty is a citizen of North Carolina, as it is a North Carolina corporation and has its principal place of business in North Carolina.  Atlantic Casualty is not a citizen of Texas.

2.     Defendant Top Gym LLC (Top Gym) is a Texas limited liability company organized under the laws of the State of Texas with its principal place of business located in Weslaco, Texas.  According to information that Top Gym has filed with the Texas Secretary of State, Top Gym has two managers:  Yasmeen San Miguel and Juan A. San Miguel, who are both individual residents and citizens of the State of Texas. Top Gym is therefore domiciled in Texas.  Top Gym may be

served with process by serving its registered agent Yasmeen San Miguel at 820 W. Mile 10 North in Weslaco, Texas, 78599, or wherever she may be found.

## II.
## JURISDICTION

3.      The Court has jurisdiction over this lawsuit under 28 U.S.C §1332(a)(1) because the Plaintiff is a citizen of a different state than the Defendant, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4.      The Court has personal jurisdiction over the Defendant because it is a citizen of and does business in Texas.

## III.
## VENUE

5.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2). The Defendant resides in this district, and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.  The alleged property damage that is the subject matter of this action occurred on real property in Hidalgo County, Texas, and the insurance policy that is the subject of this lawsuit was issued in Hidalgo County, Texas, which is in this district and division.

## IV.
## FACTS

6.      Paragraphs 1-5 set forth above are incorporated herein by reference.

7.      Atlantic Casualty brings this action for a declaratory judgment under Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

8.      According to information that Top Gym has filed with the Texas Secretary of State, Top Gym is a limited liability company formed on October 28, 2019.  Top Gym has two managers:  Yasmeen San Miguel and Juan A. San Miguel.

9.      On May 11, 2020, on behalf of Top Gym, Juan San Miguel applied for a commercial property policy for its business in a building owned by Top Gym located at 3039 W. Expressway 83 in Mercedes, Texas.  Among other things, Mr. San Miguel represented that the building had no loss history, which meant no previous claims.

10.     Atlantic Casualty issued a new commercial property policy number P070000257-0 to Top Gym with a policy period of May 18, 2020 to May 18, 2021 ("the Policy").  The Policy limits were $950,000 for the building and $500,000 for business personal property.  The Policy provided that each coverage had an 80% coinsurance requirement.  The Policy also provided for a 2% deductible for a wind/hail loss with a $2,500 minimum.  By notice mailed November 18, 2020, Atlantic Casualty notified Top Gym that the Policy would be cancelled effective December 20, 2020 because of an increase in hazard.

11.     About a month after Atlantic Casualty issued the Policy, on June 18, 2020, the building inspection, which is part of the underwriting process, and photos taken that day revealed numerous problems with the structure.  The inspector characterized the building condition as "fair."  The inspector noted problems including missing ceiling tiles, water damage on ceiling tiles in the main hall, a

rotting eave and peeling paint at the rear of the building, and poor condition of the roof on the right side.[1]

12.     This declaratory judgment action stems from a claim submitted by Top Gym under the Atlantic Casualty policy for coverage for property damage occurring on July 25, 2020 that Top Gym asserts was caused by Hurricane Hanna.  Top Gym reported the claim through its agent to Atlantic Casualty on July 27, 2020.

13.     Atlantic Casualty retained the independent adjusting firm Cross Claims Service, Inc. to investigate the claim; Cross Claims assigned its adjuster Reuben Quintero to the claim.  Mr. Quintero inspected the building on August 3, 2020.  His inspection of the roof found that there are multiple types of roofing on the building. The main gym area of the building has a gable roof with a 4/12 pitch and sprayed polyurethane foam (SPF) over a corrugated metal roof. The northwest corner of the building has a flat roof with a 1/12 pitch and also has SPF over a corrugated metal roof. The roofing of the north side center is a three tab 20 year shingle with a 1/12 pitch on the roof. Three-tab roofing material requires a minimum 3/12 pitch. Roofing on the north east corner has roll roofing. The roofing on the east side just south of the roll and three tab roofing is new seamed metal roofing which was installed approximately two months prior to the storm. The remaining roof on the east to the south is SPF over a corrugated metal roof.

14.     Mr. Quintero found damage to approximately 48 squares of SPF by strong winds and debris which impacted the east side of the building.  Foam was

---

[1] In addition, the square footage of the building was actually 20,000 square feet, not 1,500 square feet as reflected on the insurance application, which may have been due to a typographical error by the insurance agent in the application.

pulled off in several areas of the roof which allowed water to enter the building causing interior damage to ceiling, drywall walls, carpeted floors, insulation as well as finishes and trims.  The area of interior damage was approximately 4,800 square feet.  A second section of roofing which is covered with roll roofing was also damaged.  This area is approximately 950 square feet and is above the kitchen area.

15.     Mr. Quintero found minor damage to the stucco at the south side of the building which will require repair.  Mr. San Miguel had stated that gutters along the south side of the property were also damaged by the storm, however Mr. Quintero reviewed photos of the building from Google which showed that the gutters were damaged prior to 2020.  Mr. San Miguel was also claiming cracks in stucco on the exterior of the building, but damage appeared to be due to normal deterioration and not due to the storm.  Mr. San Miguel claimed that water had come under the south wall in the main gym, but it appeared to Mr. Quintero that water intrusion was due to surface water.  Mr. San Miguel was claiming fence damage but the Policy does not cover the fencing.

16.     Mr. Quintero requested that Atlantic Casualty retain a structural engineer to determine if the damage to the SPF was caused by winds.  Atlantic Casualty subsequently retained engineering firm The Vertex Industries, Inc. to perform an engineering inspection.   Forensic structural engineer Eliah Kim inspected the building on September 23, 2020, and Mr. San Miguel was present for the inspection.

17.     Mr. Kim's report noted that the exterior walls of the building were mainly clad with stucco, while a small portion above the lower roof was covered

with SPF.  The roof coverings included metal roofing, modified bitumen (mod-bit) roofing, 3-tab asphalt composition shingle roofing, and SPF roofing over older metal roofing.

18.     Mr. San Miguel told Mr. Kim that he had a portion of the roofing replaced with a new metal roof (location identified as Roof 3 in the schematic roof plan)[2] 1-1/2 months before the July 25th hurricane event.  During the installation of the metal roof, the existing SPF roof was partially cut/chipped and removed at the bottom of the gable roof at the northeast corner where the gable roof joined the metal roof in the middle of the property.  Mr. San Miguel had a portion of the mod-bit roofing patched in September 2019 (location identified as Roof 4 in the schematic roof plan).

19.     Mr. San Miguel told Mr. Kim that a portion of the roof was damaged due to wind uplift by the July 25th hurricane event (location as between Roofs 3 and 6 in the schematic roof plan) and he had this area temporarily repaired afterwards. Water leaks had occurred throughout the building since he purchased the property, but they had gotten worse after the July 25th event.  Among all the water leaks, Mr. San Miguel estimated approximately 70% of the water leaks had occurred after the July 25th event.  Mr. San Miguel became aware of the increased water leaks through the roof the day after the July 25th event.  The bulges/blisters on the SPF roofing predated the July 25th event.  The gutters and downspouts had not been properly fastened to the building on the east elevation and fell off during/after the

---

[2]  Attachment C to the Vertex engineering report is a schematic roof plan with numbers for the various areas and types of roofing used, which Mr. Kim referred to throughout the report.

July 25th event.  The southernmost gutter downspout on the west elevation was properly fastened to the building, but fell off during/after the July 25th event.

20.  In his inspection of the building, Mr. Kim observed the following, which he documented in photographs attached to his report:

Building exterior

·    The stucco finish exhibited cracks with dark crack edges and a patch in the form of different color and texture over the office area in the front end of the property.

·    There were detached and displaced gutters and downspouts on the east elevation, and the downspout at the south end of the west elevation was missing.

·    Along the roof eaves, the roofing/framing did not exhibit displacement or deformation.  Over the awning at the northeast corner, the mod-bit roof membrane was detached and lifted from the substrate at the roof edge.

·    Among the trees and utility poles in the vicinity of the property, there was only a limited amount of leaning, displacements or fractures.  The trees south of the property leaned westward.  One utility pole northwest of the property leaned eastward.  Two old trees northeast of the property exhibited broken limbs.  Most of the other trees and poles were upright and intact.

Building interior

·    The middle area of the east half of the building was closed off.  In the closed area, numerous ceiling panels had been removed, and the remaining panels exhibited dark water stains and assumed microbial growth (AMG).  Over the removed ceiling panels, multiple areas of the metal deck exhibited corrosion, punctures, and water stains on the underside.  In general, a strong musty odor was present in the closed area.

·    In the office area, there was a bulged wall finish at the south end of the west wall.

·    In the gym area, there were no water leaks in the wall or ceiling.

- In the exercise room, there were multiple areas of water leaks in the wall/ceiling. At the northeast corner, the ceiling exhibited a puncture with dark water stains surrounding the puncture.

- Over the kitchen area, there were portions of the ceiling that had been removed and the OSB roof sheathing was rotted and exhibited water stains over the removed ceiling areas.

- There were water stains in the ceiling over the men's bathroom and locker room.

Roof

- Mr. Kim measured the roof pitch at each of the roof areas and observed the roof pitches as 3/8 inch vertical over 1 foot of horizontal distance (3/8:12) on the areas referred to as Roofs 1 and 3 in the schematic roof plan, 4:12 on Roof 2, and 1:12 on Roofs 4, 5, and 6.

- There were widespread blisters, punctures, patches and dirt deposits on the SPF roof of Roof 1.   Below the areas of the punctured SPF roofing, the underlying metal roofing exhibited corrosion.  The SPF roofing consisted of 3 layers of approximately 1/4-inch thickness each. Some punctures exhibited dark edges and dirt deposits around them. The patches exhibited different colors and texture from the original SPF roofing.  A parapet wall existed at the south end of Roof 1 and 2 and the base flashing at the parapet exhibited patches in the form of different color and texture along with cracks and gaps.  On the top surface of the parapet, mastic sealant existed and exhibited craze cracks.

- On Roof 2, the SPF roof exhibited smaller blisters and punctures than the ones observed on Roof 1.  On the ridge, the top coat of paint and SPF roofing was deteriorated and had spalled off. On the western roof slope, there was an area where the top coat of paint over the roof was peeling off.  On the exterior of the north wall of the gym area over Roof 6, off the north edge of Roof 2, the SPF wall finish exhibited punctures with widths up to 1.5 inches.

- At the transition area between Roofs 2 and 3, the area where the SPF roofing at the western roof edge of Roof 2 was reportedly cut and chipped out during the installation of Roof 3. The mastic sealant along the transition flashing exhibited numerous holes and gaps.

- At the transition area between Roofs 1 and 3, the older metal panels below the SPF roofing at Roof 1 were laid on top of the newer panels at

Roof 3 without proper flashing/fastening/sealing, with steel channels over the metal panels.  At the east end of the transition area, the metal panel was punctured and the puncture was approximately 1.5 inches wide.  The metal panel was corroded in this area.  In the west end of the transition area, thin metal plates were placed on top of the metal panels with white sealant material over the metal panels and plates, with gaps between the metal panels and plates.  The gaps were up to 1/2 inch wide.

- On the metal roofing panels on Roof 3, there were multiple locations of dents consistent with mechanical impacts.

- The transition areas between Roofs 3 and 4, and between 3 and 5 were flashed with old and corroded metal panels and dented thin metal plates.  Below the metal plate flashing at the east end of the roof, there were holes that were wider than 1 inch.  Between Roofs 3 and 4, the transition was flashed with metal plates and the middle of the transition wall was not fully flashed.  The pockets between the lower metal plate flashing and flutes of the wall panels were not fully sealed, and exhibited cracks and gaps.

- The transition area among Roofs 2, 3, and 6 was the area reported by Mr. San Miguel as temporarily repaired after the July 25th event.  There were multiple holes and gaps in the mastic sealant in the transition area.

- At the eastern roof edge of Roof 4, the drip edge was placed over the mod-bit roofing membrane at the south side and exhibited approximately 3/16 inch gap below the drip edge to the roofing.  Also, the mastic sealant over the roofing exhibited approximately 1/16-inch wide cracks.  Some areas of the mod-bit roofing exhibited inadequate adhesion to the substrate below and had linear distortions.  Additionally, there was patching with mastic sealant and differently colored membrane, with deteriorated and displaced sealant over corroded nails.  Some areas of the mod-bit roof exhibited bulges, patches of mastic sealant over bulges, creases, and cracks, while other areas exhibited punctures.

- At the north end of Roof 5, there was patched mod-bit roofing along the roof edge.  The mod-bit roofing was securely fastened to the substrate below, but the nail heads were not sealed.

- At the south end of Roof 5, there were stacks of old and corroded metal panels at the transition between Roofs 3 and 5. The base flashing at the vent stack exhibited cracks with approximately 3/16-inch widths.

- At the transition area between Roofs 5 and 6, there were cracks and gaps in the base flashing with widths up to 1/4 inch. Around the edge flashing of the roof and wall, gaps and holes were present. The patched mod-bit roofing at the northeast corner of Roof 5 was loose and exhibited creasing with cracks in the mastic base flashing at the wall transition. At the northwest corner of Roof 6, the mastic sealant was deteriorated with holes up to 3/8-inch wide.

- The shingles on Roof 5 exhibited punctures over underdriven/withdrawn nails and tears with the torn edges exhibiting weathered fibers in the base mat.

- The SPF roofing at Roof 6 exhibited blisters, punctures, and patches similar to Roof 1, but with smaller sizes and number.

- On the mod-bit roofing over the awnings at the east and west sides of the property, there was detached roofing that was folded over, displaced and missing roofing, and the edges of the roofing were in general deteriorated. Some of the OSB sheathing below the roofing were exposed and exhibited weathering, deterioration, and large punctures.

21.     The engineering report had several conclusions. Based on Vertex's investigation and within a reasonable degree of engineering certainty, the main roof surfaces of the property did not sustain damage due to Hurricane Hanna and the related wind events on or about July 25, 2020. While no specific openings were caused by the storm event, the moisture intrusion occurred during the storm event due to heavy, wind-blown rainwater and water penetrating areas not vulnerable during everyday storm events.

22.     According to the reviewed meteorological data, the maximum wind gust speed did not exceed 55 mph. According to structural load data from the American Society of Civil Engineers (ASCE), the design wind speed at the property is 135 mph as calculated in publication ASCE7-16, and 110 mph as calculated in publication ASCE7-05. In general, the trees and utility poles in the area

surrounding the property did not exhibit significant displacement or fracture. Based on the available meteorological data, collateral damage surrounding the subject property, and the observed installation defects such as the blisters on the SPF roofing and wrong type of roofing for the given slope of the roof (asphalt shingles on Roof 5), the observed conditions in the roof of the property had developed over a long period of time due to deferred maintenance and improper installation, and were not the result of a single storm event.  The wind speed of the July 25th event, 55 mph, would not be expected to damage competent roofing.  In addition, the precipitation was excessive on July 26, 2020.  Such excessive rain driven by the reported wind forces had exacerbated the weakened watershedding ability of the roof at the property and caused more widespread water intrusion throughout the building.

23.     Mr. Kim did not observe evidences of impact marks on the SPF roofing such as scrapes. Although Vertex could not completely rule out windborne debris had impacted the blistered and weakened SPF roofing surfaces, causing punctures and fractures on the SPF, had the blisters not existed on the SPF roofing, the observed amount and degree of punctures and fractures would not have occurred on the roof.

24.     Mr. Kim noted the mod-bit roofing was detached and folded over at the roof over the awning at the northeast corner of the building.  The roof membrane was weathered and deteriorated, while the exposed surface of the OSB sheathing was clean and bright below the roof membrane.  The roof membrane had deteriorated over a long period of time at the connections to the substrate, and the

July 25th wind event exacerbated the conditions and detached the membrane at the corner.

25.    Mr. San Miguel indicated to Mr. Kim that prior to the July 25th event, the gutters and downspouts on the east elevation of the building had been loosely attached to the building, while the gutters and downspouts on the west elevation had been securely attached.   Mr. Kim noted that most of the downspouts and gutters were detached on the east elevation, while only one downspout was detached on the west elevation at the south end.   The detachment of the gutters and downspouts on the east elevation was due to the long term deterioration of their connections to the building, while the detachment of the downspout on the west elevation is attributable to the July 25th wind event.

26.    Regarding the water intrusion throughout the interior of the property, Mr. Kim noted that in general, the areas of the water leaks were located directly beneath areas of the breached roof membrane and in some cases above or adjacent to roof penetrations. Roofing was deteriorated in many locations throughout the roof, exhibited by blisters, punctures, cracks, gaps, crazing, and holes.  Previously patched and sealed roof areas failed and cracked at various locations, leaving the roof prone to moisture intrusion.

27.    Vertex noted that ponded water on a roof covering can introduce additional stresses, cause accelerated deterioration, and penetrate any breaches in the membrane. In the case of this property, evidence of ponded water was visible in the form of dirt deposits in multiple areas of the roof surface.

28.     At Roof 5, the roofing material used was asphalt composition shingles, which are not suitable given the low slope (1:12) of the roof.  According to 2018 International Building Code (IBC) section 1507.2.2, asphalt shingles can only be used on roof slopes that are 2:12 or greater, and the manufacturers also do not recommend using them on slopes less than 2:12 because of the limitations of the asphalt shingles.  The roof area of Roof 5 is inherently subject to poor performance in its watershedding ability.

29.     At the transition between Roofs 3 and 6, Mr. San Miguel reported to Mr. Kim that he had the area temporarily repaired for the damage on the roofing and ensuing water intrusion.  Upon reviewing photographs provided by Cross Claims Service, Inc., taken on August 3, 2020, Mr. Kim noted the existing SPF roofing was cut and removed along the transition line between the two roofs, and the SPF roofing exhibited large gaps below the heaved roofing material.  The conditions in this area were not caused by the July 25th event, but the pre-existing voids within the blisters and cutting and opening of these voids during the installation of the new metal roofing on Roof 3.

30.     In summary, Vertex concluded that the observed condition of the roof of the Top Gym building had developed over a long period of time due to deferred maintenance and improper installation and were not the result of a single storm event.

31.     By letter dated December 11, 2020, Atlantic Casualty notified Top Gym that the property damage claim was denied.  Atlantic Casualty's investigation had determined that the damages to the roof had occurred over a long period of time

and prior to the inception of the Policy on May 18, 2020.  In addition, the Policy did not provide coverage for damage caused by wear and tear; rust, corrosion or deterioration; faulty, inadequate or defective design, specifications, workmanship, repair, construction; or the faulty, inadequate or defective materials used in the repair, construction or maintenance of the property.  The Vertex report found that the property was subject to all of these deficiencies and conditions.

32.     In addition, the Vertex report found that the interior water damage was the result in deficiencies in the roof caused by deterioration, improper construction, improper repairs and maintenance.   In order for interior water damage to be covered under the Policy, the building must first sustain damage by a covered cause of loss to its roof or walls through which the rain entered.  And, in the closed section of the building, Vertex found dark water stains and assumed microbial growth, corrosion, punctures and water stains, and a strong musty odor. Under the Policy's Mold, Fungus, Bacteria, Virus or Organic Pathogen Exclusion endorsement, the Policy does not provide coverage for any damage from mold, fungus, bacteria, virus or organic pathogens.

33.     Finally, before payment could be made, the damages must exceed the deductible.  The applicable deductible under the Windstorm or Hail Percentage Deductible endorsement is $19,000.  The covered damages (a missing downspout that was properly secured during the storm and subsequently blown down by the storm) did not exceed the Policy deductible of $19,000.

34.     Top Gym's attorney has sent a demand letter to Atlantic Casualty asserting that it violated the Texas Deceptive Trade Practices Act ("DTPA"), Texas

Business & Commerce Code § 17.41, *et seq.* and the Texas Insurance Code.  Top Gym has demanded economic damages, interest, and attorneys' fees totaling $592,210.18 for its property damage claim.

## V.
## DECLARATORY JUDGMENT

35.     Paragraphs 1-34 set forth above are incorporated herein by reference.

36.     Atlantic Casualty seeks a determination from this Court that:  (1) Atlantic Casualty has no duty to indemnify Top Gym for this insurance claim and is not liable for the $592,210.18 in damages that Top Gym claims because one or more Policy provisions exclude coverage; (2) the covered damages do not exceed the Policy deductible; (3) Atlantic Casualty has not violated the DTPA in its handling of Top Gym's claim; (4) Atlantic Casualty has not violated the unfair claims settlement provisions or the prompt payment of claims provisions of the Texas Insurance Code in its handling of Top Gym's claim; (5) Atlantic Casualty has not breached the duty of good faith and fair dealing; and (6) Atlantic Casualty has not breached the insurance policy contract.

### A.
### COMMERCIAL PROPERTY CONDITIONS

37.     The Atlantic Casualty Policy has certain property conditions, including that the Policy covers loss or damage commencing during the policy period.

### *COMMERCIAL PROPERTY CONDITIONS*

*This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.*

**\*\*\*\***

### H. POLICY PERIOD, COVERAGE TERRITORY

*Under this Coverage Part:*

1. *We cover loss or damage commencing:*
    a. *During the policy period shown in the Declarations;*
   *and*
    b. *Within the coverage territory.*

**CP 00 90 07 88**

38.     The Declarations page shows that the Policy period began on May 18, 2020. The Policy was in effect until it was cancelled effective December 20, 2020. There is no coverage for the damages that Top Gym claims under the Policy as Atlantic Casualty's investigation, including the structural engineering report, determined that the damages to the roof had occurred over a long period of time and prior to the inception of the Policy on May 18, 2020.

## B.
## COMMERCIAL PROPERTY POLICY COVERAGE FORM PROVISIONS

39.     The Atlantic Casualty Policy provides coverage for direct physical loss of or damage to covered property at the insured location caused by or resulting from any covered cause of loss during the policy period. The Policy contains the CP 00 10 10 12 coverage form, which states in relevant part.

**A.     *Coverage***

*We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.*

\*\*\*

     **3.**     *Covered Causes Of Loss*

     *See applicable Causes Of Loss Form as shown in the Declarations.*

    **\*\*\***

**B.**     **Exclusions And Limitations**

     *See applicable Causes Of Loss form as shown in the Declarations.*

    **\*\*\***

**D.**     **Deductible**

     *In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss.  If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss, and will pay the resulting amount or the Limit of Insurance, whichever is less.*

     *When the Occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.*

**E.**     **Loss Conditions**

     *The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions:*

    **\*\*\***

     **3.**     *Duties In The Event Of Loss Or Damage*

     a.     *You must see that the following are done in the event of loss or damage to Covered Property:*

    **\*\*\***

          *(4)*     *Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim.  This will not increase the Limit of Insurance.  However, we will not pay for any subsequent loss or damage resulting from a cause of*

*loss that is not a Covered Cause of Loss.  Also, if feasible, set the damaged property aside and in the best possible order for examination.*

*CP 00 10 10 12*

## C.
## CAUSES OF LOSS—SPECIAL FORM PROVISIONS

40.     The Policy has the Causes of Loss—Special Form, which describes the causes of loss that are covered under the Policy.  Atlantic Casualty's investigation indicates that the causes of the reported damage to the Top Gym property are not covered.

## CAUSES OF LOSS – SPECIAL FORM

A.     **Covered Causes Of Loss**

*When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy.*

B.     **Exclusions**

1.     *We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.*

\*\*\*

h.     **"Fungus", Wet Rot, Dry Rot And Bacteria**

*Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.*

*But if "fungus", wet or dry rot or bacteria result in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".*

*This exclusion does not apply:*

(1)     *When "fungus", wet or dry rot or bacteria result from fire or lightning; or*

(2)     *To the extent that coverage is provided in the Additional Coverage, Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria,*

*with respect to loss or damage by a cause of loss other than fire or lightning.*

*Exclusions B.1.a. through B.1.h. apply whether or not the loss event results in widespread damage or affects a substantial area.*

2. *We will not pay for loss or damage caused by or resulting from any of the following:*

\*\*\*

 d. (1) *Wear and tear;*
   (2) *Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;*
   (3) *Smog;*
   (4) *Settling, cracking, shrinking or expansion;*

\*\*\*

 f. *Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.*

\*\*\*

 m. *Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.*

3. *We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.*

\*\*\*

 c. *Faulty, inadequate or defective:*

   (1) *Planning, zoning, development, surveying, siting;*
   (2) *Design, specifications, workmanship, repair, construction, renovation, re-modeling, grading, compaction;*
   (3) *Materials used in repair, construction, renovation or remodeling; or*
   (4) *Maintenance;*
 *of part or all of any property on or off the described premises.*

**C.    Limitations**

*The following limitations apply to all policy forms and endorsements, unless otherwise stated:*

1.    *We will not pay for loss of or damage to property, as described and limited in this section.  In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.*

\*\*\*

c.    *The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:*

(1)    *The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or*

(2)    *The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.*

\*\*\*

**G.    Definitions**

1.    *"Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.*

2.    *"Specified causes of loss" means the following:  fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.*

\*\*\*

c.    *Water damage means:*

(1)    *Accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam; and*

(2)     *Accidental discharge or leakage of water or waterborne material as the direct result of the breaking apart or cracking of a water or sewer pipe that is located off the described premises and is part of a municipal potable water supply system or municipal sanitary sewer system, if the breakage or cracking is caused by wear and tear.*

*But water damage does not include loss or damage otherwise excluded under the terms of the Water Exclusion.   Therefore, for example, there is no coverage under this policy in the situation in which discharge or leakage of water results from the breaking apart or cracking of a pipe which was caused by or related to weather-induced flooding, even if wear and tear contributed to the breakage or cracking.   As another example, and also in accordance with the terms of the Water Exclusion, there is no coverage for loss or damage caused by or related to weather-induced flooding which follows or is exacerbated by pipe breakage or cracking attributable to wear and tear.*

*To the extent that accidental discharge or leakage of water falls within the criteria set forth in c.(1) or c.(2) of this definition of "specified causes of loss," such water is not subject to the provisions of the Water   Exclusion   which   preclude   coverage   for surface water or water under the surface of the ground.*

*CP 10 30 10 12*

41.    The Policy does not provide coverage for damage caused by wear and tear; rust, corrosion or deterioration; faulty, inadequate or defective design, specifications, workmanship, repair, or construction; or the faulty, inadequate or defective materials used in the repair, construction or maintenance of the property. The property was subject to all of these deficiencies and conditions.

42.    In addition, the interior water damage was the result in deficiencies in the roof caused by deterioration, improper construction, improper repairs and

maintenance.  In order for interior water damage to be covered under the Policy, the building must first sustain damage by a covered cause of loss to its roof or walls through which the rain entered.

**D.**
**MOLD, FUNGUS, BACTERIA, VIRUS OR ORGANIC PATHOGEN EXCLUSION**

43.    The Policy contains a Mold, Fungus, Bacteria, Virus or Organic Pathogen Exclusion endorsement which reads as follows:

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

*MOLD, FUNGUS, BACTERIA OR ORGANIC PATHOGEN EXCLUSION – PROPERTY*

*This endorsement modifies insurance provided under the following:*
*Building and Personal Property Coverage Form*
*Causes of Loss – Basic Form*
*Causes of Loss – Broad Form*
*Causes of Loss – Special Form*

*The following sections of your policy(ies) are deleted:*
*On the CP 00 10, A. Coverage, 4. Additional Coverages, d. Pollutant Clean-up Removal;*
*On the CP 1010, C. Additional Coverage – Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria;*
*On the CP 1020, D. Additional Coverage – Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria; and*
*On the CP 1030, E. Additional Coverage – Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria;*

*We will not pay for loss or damage:*

1. *to direct physical loss of or damage to Covered Property;*
2. *to your expenses to remove debris of Covered Property;*
3. *to any actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration";*
4. *to any extra expense you incur during the "period of restoration";*

5.      *to damages for the devaluations of property or for the taking, use or acquisition of interference with the rights of others in property or air space;*

6.      *to any loss, cost or expense, including but not limited to fines and penalties, arising out of any governmental direction or request, or any private party or citizen action, that an insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize "organic pathogen"; or*

7.      *to any litigation or administration procedure in which an insured may be involved as a party;*

*arising directly, indirectly, or in concurrence, or in any sequence out of actual, alleged or threatened existence, discharge, dispersal, release or escape of "organic pathogen", whether or not such actual, alleged or threatened existence, discharge, dispersal, release or escape is sudden, accidental or gradual in nature.*

*"Organic pathogen" means any organic irritant or contaminant, including but not limited to mold, "fungus", bacteria or virus, including but not limited to their byproducts such as mycotoxin, mildew, or biogenic aerosol.*

*All other terms and conditions of the policy remain unchanged.*

***CP MOLD (12/14)***

44.    In the closed section of the insured building, the structural engineer found dark water stains and assumed microbial growth, corrosion, punctures and water stains, and a strong musty odor.  Under the Policy's Mold, Fungus, Bacteria, Virus or Organic Pathogen Exclusion endorsement, the Policy does not provide coverage for any damage from mold, fungus, bacteria, virus or organic pathogens.

### E.
### WINDSTORM OR HAIL PERCENTAGE DEDUCTIBLE

45.    The Policy has a Windstorm or Hail Percentage Deductible endorsement, which provides for a 2% deductible for a wind/hail loss with a $2,500 minimum, and reads in relevant part as follows:

*THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.*

### WINDSTORM OR HAIL PERCENTAGE DEDUCTIBLE

*This endorsement modifies insurance provided under the following:*

*BUILDERS RISK COVERAGE FORM*
*BUILDING AND PERSONAL PROPERTY COVERAGE FORM*
*CONDOMINIUM ASSOCIATION COVERAGE FORM*
*CONDOMINIUM*
*COMMERCIAL UNIT-OWNERS COVERAGE FORM STANDARD*
*PROPERTY POLICY*
*TOBACCO SALES WAREHOUSES COVERAGE FORM*

### SCHEDULE

| Premises Number | Building Number | Windstorm Or Hail Deductible Percentage - Enter 1 %, 2%, 3% or 5% and $1,000, $2,500 or $5,000 Minimum |
|---|---|---|
| *1* | *1* | *2 % Subject to $2,500 Minimum* |
| | | *% Subject to $ Minimum* |
| | | *% Subject to $ Minimum* |
| *Information required to complete this Schedule, if not shown above, will be shown in the Declarations.* | | |

*The Windstorm or Hail Deductible, as shown in the Schedule and set forth in this endorsement, applies to covered loss or damage caused directly or indirectly by Windstorm or Hail. This Deductible applies to each occurrence of Windstorm or Hail.*

*Nothing in this endorsement implies or affords coverage for any loss or damage that is excluded under the terms of the Water Exclusion or any other exclusion in this policy. If this policy is endorsed to cover Flood under the Flood Coverage Endorsement (or if you have a flood insurance policy), a separate Flood Deductible applies to loss or damage attributable to Flood, in accordance with the terms of that endorsement or policy.*

*As used in this endorsement, the terms "specific insurance" and "blanket insurance" have the following meanings: Specific insurance covers each item of insurance (for example, each building or personal property in a building) under a separate Limit of Insurance. Blanket insurance covers two or more items of insurance (for example, a building and personal property in that building, or two buildings)*

*under a single Limit of Insurance. Items of insurance and corresponding Limit(s) Of Insurance are shown in the Declarations.*

**WINDSTORM OR HAIL DEDUCTIBLE CALCULATIONS**

A.    *Calculation Of The Deductible - All Policies*

    1.    *A Deductible is calculated separately for, and applies separately to:*
    *a. Each building that sustains loss or damage;*
    *b. The personal property at each building at which there is loss or damage to personal property; and*
    *c. Personal property in the open.*
    *If there is damage to both a building and personal property in that building, separate deductibles apply to the building and to the personal property.*

    2.    *We will not pay for loss or damage until the amount of loss or damage exceeds the applicable Deductible. We will then pay the amount of loss or damage in excess of that Deductible, up to the applicable Limit of Insurance, after any reduction required by any of the following: Coinsurance Condition; Agreed Value Optional Coverage; or any provision in a Value Reporting Form relating to full reporting or failure to submit reports.*

    *CPACI 03 21 02 17*

46.    Before payment can be made under the Policy, the damages must exceed the deductible.   The applicable deductible under the Windstorm or Hail Percentage Deductible endorsement is $19,000.   The covered damages (a missing downspout that was properly secured during the storm and subsequently blown down by the storm) did not exceed the Policy deductible of $19,000.

**F.**
**DECEPTIVE TRADE PRACTICES ACT**

47.    The demand letter to Atlantic Casualty sent by Top Gym's counsel asserts that Atlantic Casualty violated the Texas Deceptive Trade Practices Act (DTPA).  The letter asserted that Atlantic Casualty "has conducted an inadequate examination of the damage from the storm damage and the claims made" by Top Gym.   To the contrary, Atlantic Casualty has conducted a very thorough examination of the claim by first retaining an independent adjuster and then retaining a structural engineering firm to inspect the damage.  The investigation revealed that the damage to the Top Gym building had developed over a long period of time due to deferred maintenance and improper installation and was not the result of a single storm event.  Top Gym's demand letter merely cites elements of the DTPA without supplying any facts that would show Atlantic Casualty has violated the DTPA.  Atlantic Casualty has not violated the DTPA or engaged in any false, misleading or deceptive acts or practices regarding Top Gym.

**G.**
**TEXAS INSURANCE CODE**

48.    The DTPA demand letter that Top Gym's counsel sent to Atlantic Casualty also alleges that Atlantic Casualty has violated the Texas Insurance Code. As with the citations to the DTPA, the letter simply provides a list of statutory violations of the Texas Insurance Code without showing facts to support any Insurance Code violation.[3]  Atlantic Casualty has thoroughly investigated the claim

---

[3]  In the absence of some specific misrepresentation by the insurer or agent about the insurance, a policyholder's mistaken belief about the scope or availability of coverage is not actionable under the

and has found that the damage was due to causes like deferred maintenance and wear and tear that are not covered under the Policy.  Atlantic Casualty did not engage in unfair claims settlement practices or engage in any other Insurance Code violation in handling Top Gym's claim which presented causes of loss not covered by the Policy.

## H.
### DUTY OF GOOD FAITH AND FAIR DEALING

49.     Top Gym's demand letter to Atlantic Casualty asserts that Atlantic Casualty has "violated the duty of good faith and fair dealing by refusing to pay the claims in question even though [Atlantic Casualty] knew or should have known that it was reasonably clear the claims were covered."  In fact, the claim is not covered as the damage was due to causes like deferred maintenance and wear and tear that are not covered under the Policy.  Atlantic Casualty had a reasonable basis for denial of Top Gym's claim due to the fact that there is no coverage for the causes of loss existing in the claim.

## I.
### BREACH OF CONTRACT

50.     Finally, Top Gym's demand letter to Atlantic Casualty asserts that "by failing to pay benefits under the policy of insurance, Atlantic Casualty Insurance Company breached the contract of insurance" with Top Gym.  An insured is bound by the terms of its policy and is charged with knowledge of its conditions and coverage. The commercial property policy that Atlantic Casualty issued to Top Gym

---

Texas Insurance Code.  *Moore v. Whitney-Vaky Ins. Agency*, 966 S.W.2d 690, 692-93 (Tex. App.—San Antonio 1998, no pet.).

provides no coverage for its property damage claim.  Deferred maintenance and the many other issues revealed through the investigation of the claim are not covered causes of loss so that Atlantic Casualty has not breached the contract.

## VI.
## PRAYER

For the reasons set forth above, Atlantic Casualty Insurance Company asks for judgment against the Defendant Top Gym for:

a.     a declaration that:  (1) Atlantic Casualty has no duty to indemnify Top Gym for this insurance claim and is not liable for the $592,210.18 in damages that Top Gym claims because one or more Policy provisions exclude coverage; (2) the covered damages do not exceed the Policy deductible; (3) Atlantic Casualty has not violated the DTPA in its handling of Top Gym's claim; (4) Atlantic Casualty has not violated the unfair claims settlement provisions or the prompt payment of claims provisions of the Texas Insurance Code in its handling of Top Gym's claim; (5) Atlantic Casualty has not breached the duty of good faith and fair dealing; and (6) Atlantic Casualty has not breached the insurance policy contract.

b.     costs of court;

c.     interest allowed by law for prejudgment and post-judgment interest; and

d.     all other relief the Court deems proper.

Respectfully submitted,

SAVRICK, SCHUMANN, JOHNSON,
MCGARR, KAMINSKI & SHIRLEY, L.L.P.

By: _____
Camille Johnson, attorney-in-charge
State Bar No. 10686600
Southern Dist. Bar No. 16414
4621 Ross Avenue, Suite 300
Dallas, Texas 75204
Phone: (214) 368-1515
Fax: (214) 292-9647
Email: camille@ssjmlaw.com

**COUNSEL FOR PLAINTIFF, ATLANTIC
CASUALTY INSURANCE COMPANY**